**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------x
```
IN RE: FOSAMAX PRODUCTS LIABILITY   :
LITIGATION

                                   :     MASTER FILE

                                   :     MDL No. 1789
```
_____x
```
                                          1:06-md-1789 (JFK)

*This Document Relates to*            :

<u>Gwendolyn Wolfe, et al., v. Merck</u>  :     **MEMORANDUM OPINION &**
<u>& Co., Inc.</u>, 1:06-cv-6295 (JFK)          **ORDER**
                                   :
<u>Greta Murphy v. Merck & Co., Inc.</u>,
1:07-cv-1946 (JFK)                    :

<u>Aline Trahan v. Merck & Co., Inc.</u>,  :
1:06-cv-9456(JFK)
                                   :
```
-----------------------------------x
```
**JOHN F. KEENAN, United States District Judge:**

## Introduction

In this multidistrict litigation ("MDL"), more than
three hundred and sixty products liability actions have been
filed by individuals who claim to have taken Fosamax, a
prescription drug approved for the treatment of osteoporosis and
other bone disorders, against Merck & Co., Inc., the drug's
manufacturer.  Common to all actions is the allegation that
ingesting Fosamax caused plaintiffs to either develop a medical
condition known as osteonecrosis of the jaw ("ONJ") or to suffer
a significantly increased risk of developing the condition in

the future.  These cases have been transferred to this Court for

coordinated pretrial proceedings pursuant to 28 U.S.C. § 1407.

Currently before the Court are motions filed by

putative class representatives to certify three state-wide

classes.  The proposed classes are defined to include all

current and former users of Fosamax in the states of

Pennsylvania, Florida and Louisiana who have not been diagnosed

with ONJ.  Each class would bring a claim for medical monitoring

under the respective laws of those three states.  They would

seek to have Merck set up and fund a program that would

administer to all class members a regimen of dental procedures

intended to monitor for ONJ.

In connection with the present motions, the parties

have established an extensive evidentiary record.[1]  The Court

heard oral argument on the motions on November 30, 2007.

_____

[1] This record consists of the expert affidavits of plaintiffs'
dental experts, Robert E. Marx, D.D.S. ("Marx Aff.") and Alistair N.
Goss, D.D.Sc ("Goss Aff."); plaintiffs' claims administration expert
Paul Mulholland, C.P.A., C.V.A. ("Mulholland Aff."), who described how
the proposed dental monitoring program would be administered;
defendant's medical expert, John Bilezikian, M.D. ("Bilezikian Aff.");
defendant's expert Jeri W. Nieves, PH.D., an epidemiologist who
specializes in osteoporosis ("Nieves Aff."); defendant's oral and
maxillofacial expert Robert S. Glickman, D.M.D. ("Glickman Aff.); and
defendant's chemistry expert, Paul A. Bartlett ("Bartlett Aff.").  The
parties have also submitted excerpts from the deposition transcripts
of several of these experts (hereinafter referred to as the deponent's
surname followed by "Dep. Tr.").  The evidentiary record also consists
of selected interrogatory responses, excerpts from the deposition
transcripts and the plaintiff profile forms ("PPF's") of the three
putative class representatives, Mr. Trent Nichols, Jr., M.D., Ms.
Aline Trahan, and Ms. Greta V. Murphy; an August 2004 post-marketing
safety review from the FDA's Office of Drug Safety ("2004 ODS Post-

2

This decision on class certification is not about whether Fosamax causes or significantly increases the risk of ONJ, or whether Merck was or was not negligent in labeling Fosamax, or whether the proposed dental monitoring program is an effective way to prevent the onset of ONJ. These questions will be resolved at future stages of these proceedings. The narrow question before the Court is whether, under Federal Rule of Civil Procedure 23, a class action is a proper vehicle for litigating the state-law medical monitoring claims brought by the named plaintiffs. For the reasons discussed below, the Court finds that class-treatment of these claims is inappropriate because they present too many individual questions of fact particular to each class member's claim. Accordingly, the motions for class certification are DENIED.

## I. Background

**A.  Fosamax**

Fosamax is an oral prescription drug approved by the U.S. Food and Drug Administration ("FDA") for the treatment of

---

Marketing Safety Review); and an FDA report showing the number of cases in which doctors reported adverse drug experiences associated with Fosamax in 1996 ("1996 FDA ADE Report"). The parties have also brought to the Court's attention over forty articles and chapters from the oral and maxillofacial, medical and dental literature discussing ONJ and, among other things, its causes, diagnosis, treatment and relationship to oral biphosphonates such as Fosamax.

osteoporosis and other bone disorders.[2]  Osteoporosis afflicts
more than 10 million Americans over the age of fifty, eighty
percent of whom are women. (DX. 22.)[3]  The disorder is
characterized by reduced bone density and quality that
diminishes bone strength and increases susceptibility to
fractures.  Throughout a person's life, his or her bones
continuously undergo a remodeling cycle whereby older bone is
resorbed (broken down) and new bone is formed to replace it.
Osteoporosis results from an imbalance in this bone turnover
cycle that is associated with, among other things, aging and the
drop in estrogen levels in post-menopausal women.  The cells
responsible for resorption (osteoclasts) are overactive and/or
the cells responsible for bone formation (osteoblasts) are
underactive, resulting in net bone loss.  A person is diagnosed
with osteoporosis when his or her bone density falls a certain
level below normal.

    Approved by the FDA in September 1995, Fosamax seeks
to restore this balance and decrease bone loss by inhibiting
resorption and reducing the rate of bone turnover.  The active
ingredient in Fosamax is alendronate, a compound consisting of a
bisphosphonate and a nitrogen-containing amino group.  The

_____

    [2]  Fosamax is also prescribed to treat Paget's disease of bone and
osteopenia.

    [3]  "DX" refers to defendant's exhibit.

4

parties dispute several issues with respect to the effects of nitrogen-containing bisphosphonates:  whether they merely inhibit the function of osteoclasts or kill them; whether bone turnover is reduced to rates within a normal range or completely inhibited; whether or not bisphosphonate remains active over its 10-12 year half life when it is taken up into the bone, producing a cumulative effect on bone turnover; and whether or not it accumulates preferentially in the jaws, which have a relatively high turnover rate.  These issues need not be addressed at this stage of the proceedings.

Fosamax is one of several oral bisphosphonates currently on the market to treat osteoporosis and other bone disorders.  Since their market introduction, doctors have prescribed oral bisphosphonates over 191 million times; 77% of these prescriptions have been for alendronate (Nieves Aff. ¶ 20).  The FDA has also approved intravenously-administered bisphosphonates, which are much more potent and are prescribed to treat metastatic bone disease resulting principally from myeloma and breast cancer.[4]

B. <u>Osteonecrosis of the Jaws</u>

Osteonecrosis of the jaws ("ONJ") is a condition

_____

[4] Actions filed by persons who have taken intravenous bisphosphonates and allege ONJ-related injuries have been consolidated in the Middle District of Tennessee as <u>In re Aredia and Zometa Prods. Liab. Litig.</u>, MDL No. 1760.

characterized by an area of exposed bone in the oral cavity that does not heal or heals poorly within a normal healing time. The area often becomes infected, causing pain, swelling and purulent secretion. (PX R.)[5] In a small percentage of cases where antibiotics and regular irrigations are not effective in preventing or treating infection, regions of necrotic bone must be surgically removed. (PX G, K.).

The cause or causes of this rare but painful, disfiguring and debilitating condition are not fully understood or agreed upon. Plaintiff's expert, Dr. Marx, states that ONJ may be caused by each of the following: osteoradionecrosis (radiation therapy to the head and neck), osteomyelitis (infection in the jaw), osteopetrosis (a genetic defect in the osteoclast cell) and trauma to the jaw. (Marx Aff. ¶ 17.) He also states that some practitioners believe that long-term steroid use and various forms of chemotherapy can cause ONJ, although he does not believe so. (Id.) Defendant's experts add to the list of risk factors for ONJ the following: cancer, HIV disease, immunosuppressed hosts, herpes infection, periodontal disease, poor oral hygiene, invasive dental procedure, anemia and coagulapathy (a defect in the blood-clotting process). (Bilezikian ¶ 31; Glickman ¶ 9; Nieves Aff. ¶ 17.)

---

[5] "PX" refers to plaintiffs' exhibit.

There is no definitive treatment for ONJ. Studies have found that the treatment outcomes of surgery, antibiotics and hyperbaric oxygen therapy are poor and that, for most ONJ patients, the area of exposed bone will remain permanently. (PX R; Robert E. Marx, Oral & Intravenous Bisphosphonate-Induced Osteonecrosis of the Jaws 63 (2007)). Therefore, those at risk for the condition should seek to prevent its development by obtaining proper dental care and avoiding invasive dental procedures.

### C. **Bisphosphonate-associated ONJ**

The first cases of ONJ associated with intravenous bisphosphonate use were reported by Dr. Marx in the medical and dental literature in the fall of 2003. ONJ associated with the use of oral bisphosphonates was first reported in the literature by another doctor in the spring of 2004. (Bilezikian ¶ 32; Glickman ¶ 10). Dr. Marx asserts that, since 2003, more than five thousand cases of ONJ have been reported in people using bisphosphonates. (Marx Aff. ¶ 24.) Invasive oral surgical procedures initiated ONJ in most of these cases, but the condition has also presented spontaneously in a small number of cases. The parties' experts agree that ONJ is much more rarely associated with oral bisphosphonates such as Fosamax than with the more potent intravenous bisphosphonates. (Bilezikian ¶ 33; Goss ¶¶ 38-39; Marx et al., Oral Bishposphonate-Induced

Osteonecrosis, J. Oral Maxillofacial Surgery 65: 2397–2410
(2007)).

In an August 2004 Post-Marketing Safety Review, the FDA
found that, as of May of that year, physicians had reported 139
cases of ONJ associated with intravenous bisphosphonates and 12
associated with oral bisphosphonates to the FDA's Adverse Event
Reporting System. The review concluded that the incidence of
ONJ may be an event associated with all bisphosphonates, rather
than limited to intravenous bisphosphonates, and recommended
that the product labels of oral bisphosphonates include language
reflecting this association. In January 2005, the FDA asked
Merck to update Fosamax's label to include class-labeling for
ONJ. After obtaining FDA approval of the language of a revised
label, Merck made the new label publicly available in July 2005.
On Page 13 of the revised label, under the heading
"Precautions," it states in pertinent part:

> Osteonecrosis of the jaw, generally associated with
> tooth extraction and/or local infection, often with delayed
> healing, has been reported in patients taking
> bisphosphonates. Most reported cases of bisphosphonate-
> associated osteonecrosis have been in cancer patients
> treated with intravenous bisphosphonates, but some have
> occurred in patients with postmenopausal osteoporosis.
> Known risk factors for osteonecrosis include a diagnosis of
> cancer, concomitant therapies (e.g., chemotherapy,
> radiotherapy, corticosteroids), poor oral hygiene, and co-
> morbid disorders (e.g., pre-existing dental disease,
> anemia, coagulopathy, infection).
> Patients who develop osteonecrosis of the jaw (ONJ)
> while on bisphosphonate therapy should receive care by an
> oral surgeon. Dental surgery may exacerbate the condition.
> For patients requiring dental procedures, there are no data
> available to suggest whether discontinuation of

bisphosphonate treatment reduces the risk for ONJ. Clinical judgment of the treating physician should guide the management plan of each patient based on individual risk/assessment.

(DX 23). Six pages later, under the heading of "Adverse Reactions," the label states that "Localized osteonecrosis of the jaw, generally associated with tooth extraction and/or local infection, often with delayed healing, has been reported rarely." (Id.)

ONJ's association with oral bisphosphonates has been documented by many experts and leading oral and maxillofacial, dental, and medical associations. (PX BB, CC, EE). Estimates of the incidence of oral bisphosphonate-associated ONJ vary widely. On the high end, plaintiff's expert Dr. Goss estimates that the frequency of ONJ for patients taking oral bisphosphonates for osteoporosis is 1 in 2,260 to 8,470 (0.01 to 0.04%) (Goss Aff. ¶¶ 20, 23). He found the frequency to be substantially higher for the relatively small percentage of patients taking oral bisphosphonates to treat Paget's disease and for those patients who had dental extractions (Goss ¶¶ 20, 22, 24). On the low end, Merck's experts estimate the frequency at about 0.7-1.0 in 100,000 patient years of exposure (0.0007 to

0.001%), noting that this is only slightly higher than the risk of death by lightning strike.[6] (Bilezikian ¶ 36.)

Not surprisingly, the parties dispute whether a causal relationship exists between oral bisphosphonates such as Fosamax and ONJ. This merits question need not be addressed in order to decide the class certification motions.

There seems to be some consensus that oral bisphosphonate-associated ONJ may depend on several factors. For example, Dr. Goss states that the frequency of the disease depends on the dosage taken, the duration of use and whether the drug was prescribed to treat osteoporosis or Paget's disease. (Goss Aff. ¶¶ 9, 36, 39). Dr. Marx also states that the degree of bone turnover suppression, which he asserts is the mechanism by which Fosamax causes ONJ, depends upon the length of time that a patient uses the drug and whether and for how long the patient discontinues its use. (Marx Aff. ¶ 39). He reports that, according to his research, the risk of ONJ is "small" and "insignificant" until a patient uses Fosamax continuously for three years. (Marx Dep. Tr. at 80.) It also appears from the expert affidavits submitted that a Fosamax user's medical history, i.e. the absence or presence of the risk factors for

---

[6] An American Dental Association panel concluded that "there is a very low risk (estimated at 0.7 cases per 100,000 patient-years exposure) of developing [bisphosphonate-associated ONJ]." (PX BB at 1147.)

ONJ listed above, affects his or her risk of developing the condition.

**D.   The Proposed Classes**

1.   The Class Representatives

The present motions seek certification of three state-wide classes under Federal Rule of Civil Procedure 23(b)(3). The three putative class representatives are Dr. Trent Nichols, Jr., a resident of Pennsylvania, Ms. Greta V. Murphy, a resident of Florida, and Ms. Aline Trahan, a resident of Louisiana. These individuals would represent all persons in their respective home states "who are taking or have taken Fosamax, and who do not have a prior diagnosis of osteonecrosis of the jaw." (Plaintiffs' Mem. at 15.)

Dr. Nichols is a licensed physician specializing in gastroenterology who used Fosamax between September 1996 and May 1999 to treat osteoporosis.  He took samples provided to him by Merck pharmaceutical representatives and also received extensive information about Fosamax from these representatives.   On his plaintiff profile form ("PPF"), he reports that his dentist warned him that he has "a very dense jaw due to taking Fosamax." (Nichols PPF § I.D.5.b).  An orthopedic surgeon has told him that "there was a possibility of having future harm because if I get a tooth extracted it could go from [o]steopetrosis, dense jaw, to [o]steonecrosis." (Id. § I.D.7.)  He does not recall the

11

date of either of these discussions.  Nichols seeks dental monitoring for the alleged increased risk of ONJ that he has suffered as a result of taking Fosamax.  He also claims that Fosamax caused him avascular necrosis of the hip, a disease resulting from insufficient blood supply to the bone, and osteonecrosis of the hip and is seeking monetary damages.  Dr. Nichols has observed good dental hygiene both before and after using Fosamax, brushing twice a day, flossing once a day, and seeing a dentist for a cleaning four times a year.

Ms. Murphy was prescribed Fosamax for treatment of osteoporosis between January 2001 and August 2005.  Her prescription records indicate several long gaps in her use of the drug.  On her PPF, she specifies no other injury caused by Fosamax other than an increased risk of ONJ.  During her deposition, she stated that she had never been told by a doctor or anyone else that she has a heightened risk of developing ONJ. She also indicated a belief that Fosamax caused the enamel to break off one of her teeth.  In addition to dental monitoring, she is seeking unspecified monetary damages for medical expenses related to conditions caused by Fosamax.  Like Dr. Nichols, Ms. Murphy claims that she maintains proper dental hygiene.

Ms. Trahan used Fosamax between 2001 and 2006 to treat osteopenia and osteoporosis.  Like the other proposed representatives, she claims to have suffered an increased risk

of ONJ as a result of using the drug. She also alleges that the increased risk has caused her mental distress for which she seeks monetary damages. She has had no diagnosis of other bone disorders and maintains good dental hygiene.

   2.   The Classes' Claims

Each state-wide class would bring a claim for medical monitoring under the laws of Florida, Pennsylvania and Louisiana, respectively. Courts in each of these states have recognized a substantive cause of action for medical monitoring. Under Pennsylvania and Florida law, a plaintiff may recover for medical monitoring after proving seven elements:

   (1) exposure greater than normal background levels;
   (2) to a proven hazardous substance;

   (3) caused by the defendant's negligence;

   (4) as a proximate result of the exposure, plaintiff has a
   significantly increased risk of contracting a serious
   latent disease;

   (5) a monitoring procedure exists that makes the early
   detection of the disease possible;

   (6) the prescribed monitoring regime is different from that
   normally recommended in the absence of the exposure; and

   (7) the prescribed monitoring regime is reasonably
   necessary according to contemporary scientific principles.

Redland Soccer Club, Inc. v. Dept. of the Army and Dept. of Defense of the U.S., 696 A.2d 137, 145-46 (Pa. 1997); Wyeth, Inc. v. Gottlieb, 930 So. 2d 635 (Fla. App. 3 Dist. 2006). Louisiana's highest court ruled in 1998 that a plaintiff may recover on a medical monitoring claim upon proof of essentially

the same seven elements, but the Louisiana Legislature amended
the law the next year to require proof of the additional element
that the medical monitoring is "directly related to a manifest
physical or mental injury or disease." La Civ. Code Ann. art.
2315; Bourgeois v. A.P. Green Indus., Inc., 783 So. 2d 1251 (La.
2001).

The relief sought by all three putative classes is the
creation and funding by Merck of a monitoring program that would
provide a regimen of dental and medical tests and services to
each class member. Specifically, each class member would
receive a twice yearly dental examination that includes the
taking of a comprehensive dental and medical history, a
panoramic radiograph, a CTX test, which measures bone
resorption, dental cleaning, a detailed examination, and a
consultation report that would be shared with the class member's
medical physician.

## II. Applicable Law

Class certification is proper where an action
satisfies the requirements of Federal Rule of Civil Procedure
23. A court must conduct a "rigorous analysis" to determine if
those requirements are met, In re Initial Public Offering
Securities Litig., 471 F.3d 24, 29 (2d Cir. 2006)(quoting Gen.
Telephone Co. of the Southwest v. Falcon, 457 U.S. 147, 160-61

(1982)), resolving any factual disputes relevant to the Rule 23 analysis. <u>Id.</u> at 41. In considering whether to certify a class, a court may not address the merits of the action except to the extent that a merits issue overlaps with a Rule 23 requirement. <u>Id.</u> The determination as to a Rule 23 requirement is made only for the purposes of class certification and is not binding on the trier of facts at the subsequent merits stage of the action. <u>Id</u>.

Rule 23(a) sets forth four prerequisites to certification: numerosity, commonality, typicality and adequacy. In addition to these prerequisites, an action only may be certified if it fits one of three categories listed in Rule 23(b). Plaintiffs seek to have their proposed class actions certified under Rule 23(b)(3), which permits certification if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Plaintiffs bear the burden of showing that their proposed class actions meet the four prerequisites of Rule 23(a) and the "predominance" and "superiority" requirements of Rule 23(b)(3).

Rule 23 contains the additional, implicit requirement that an ascertainable class exists and has been properly defined. 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc. § 1760 (2007). "An identifiable class exists if its members can be ascertained by reference to objective criteria." In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation, 209 F.R.D. 323, 337 (S.D.N.Y. 2002). It must be "administratively feasible for a court to determine whether a particular individual is a member" of the class. Rios v. Marshall, 100 F.R.D. 395, 403 (S.D.N.Y. 2002). Individual class members need not be identified prior to certification, but class membership must be ascertainable prior to the end of the action. In re Initial Public Offering Securities Litigation. 227 F.R.D. 65, 88 (S.D.N.Y. 2004). Identifying class members is especially important in Rule 23(b)(3) actions, in order to give them the notice required by Rule 23(c)(4) so that they may decide whether to exercise their right to opt out of the class. The Court also must be able to determine the class' membership "without having to answer numerous fact-intensive inquiries." Daniels v. City of New York, 198 F.R.D. 409, 414 (S.D.N.Y. 2001). Courts have also rejected class definitions that are overly broad, amorphous or vague.

See, e.g., Perez v. Metabolife Int'l, Inc., 218 F.R.D. 262, 269 (S.D. Fla. 2003).

### III.  Discussion

At the outset, it should be noted that the class action device typically is not very useful in mass tort cases, which tend to "present 'significant questions, not only of damages but of liability and defenses of liability, ... affecting the individuals in different ways.'" Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 (1997) (alteration in original) (quoting the Adv. Comm. Notes, 28 U.S.C. App., p. 697); Blyden v. Mancusi, 186 F.3d 252, 270 (2d Cir. 1999) (decertifying civil rights class and noting that Amchem's analysis "sharply curtailed the ability to certify a class action pursuant to Rule 23(b)(3) in the mass tort context"). This statement bears particular emphasis in products liability actions where, characteristically:

> No single happening or accident occurs to cause similar types of physical harm or property damage. No one set of operative facts establishes liability. No single proximate cause applies equally to each potential class member and each defendant. Furthermore, the alleged tortfeasor's affirmative defenses (such as failure to follow directions, assumption of the risk, contributory negligence, and the statute of limitations) may depend on facts peculiar to each plaintiff's case.

In re American Medical Systems, Inc., 75 F.3d 1069, 1084-85 (6th Cir. 1996) (decertifying class of persons claiming injury from

17

implantation of penile prosthesis).[7]  Lower courts almost

unanimously have rejected class certification in pharmaceutical

products liability actions, including those seeking medical

monitoring for a heightened risk of future injury, because the

proposed class actions failed to satisfy many of Rule 23's

requirements.[8]

---

[7] Many Courts of Appeals have noted the difficulties posed by
class-treatment of mass products liability cases, although some have
expressed a greater degree of skepticism than others.  Compare Matter
of Rhone-Poulenc Rorer, Inc., 51 F.3d 1293, 1304 (7th Cir.
1995)(noting criticism of the use of class actions in mass tort cases
and decertifying class of hemophiliacs alleged to have contracted HIV
following infusion of defendants' blood products), and Castano v. Am.
Tobacco Co.,  84 F.3d 734, 746 (5th Cir.1996)(decertifying class of
smokers and noting that certification skews trial outcomes and
increases pressure on defendants to settle), with Valentino v. Carter-
Wallace, Inc., 97 F.3d 1227, 1233 (9th Cir. 1996) (decertifying
pharmaceutical drug class but refusing to "close the door on class
action litigation in products liability cases"), and Barnes v. Am.
Tobacco Co., 161 F.3d 127, 142 (3rd Cir. 1998) (upholding
decertification of class of smokers and noting that individualized
issues tend to predominate in mass tort accidents that do not arise
out of a single accident). Cf. In re Agent Orange Prod. Liab.
Litigation, MDL No. 381, 818 F.2d 145, 151 (2d Cir. 1987)(expressing
skepticism toward utility of class actions in the mass tort context
but upholding certification of class of persons exposed to Agent
Orange solely because the military contractor defense would apply in
all cases).

[8] See In re Aredia and Zometa Prods. Liab. Litig., 06-MD-1760,
2007 WL 3012972 (M.D. Tenn. Oct. 10, 2007)(users of intravenous-
bisphosphonate drugs seeking dental monitoring for ONJ); In re Vioxx
Prods. Liab. Litig., 239 F.R.D. 450 (E.D. La. 2006) (recalled
prescription pain medication); In re Prempro Prods. Liab. Litig., 230
F.R.D. 555 (E.D. Ark. 2005)(menopause drug); Foster v. St. Jude
Medical, Inc., 229 F.R.D. 599, 604-05 (D.C. Minn. 2005)(heart bypass
device); Zehel-Miller v. Astrazenaca Pharmaceuticals, LP, 223 F.R.D.
659, 663 (M.D. Fla. 2004)(depression drug); In re Baycol Prods.
Litig., 218 F.R.D. 197 (D. Minn. 2003) (recalled cholesterol drug);
Perez v. Metabolife Int'l, Inc., 218 F.R.D. 262 (S.D. Fla.
2003)(recalled over-the-counter dietary supplement); In re Paxil, 212
F.R.D. 539 (C.D. Cal. 2003)(drug prescribed to treat depression,

The outcome of the Rule 23 analysis is no different in
this case. Class certification is improper because (1) the
motions fail to define a proper class; (2) the class
representatives do not satisfy the typicality and adequacy
requirements of Rule 23(a); and (3) individual questions of fact
and law predominate over common ones and class treatment of
these claims would not be superior to case-by-case
adjudication.

A.  <u>Definition of a Proper Class</u>

The proposed class definitions do not set any dosage
or duration of use limitations on class membership.  Nor do they
attempt to screen out persons with unique risk factors for ONJ.
Plaintiffs also fail to specify the duration of the prposed
dental monitoring program.  Were the proposed class certified,
the named plaintiffs would seek dental monitoring for an
indefinite period for anyone in Pennsylvanilda, Florida or
Louisiana who took even a single tablet of Fosamax at any time
(subject to the applicable statute of limitations).  The

anxiety and other disorders); <u>In re Rezulin Prods. Liab. Litig.</u>, 210
F.R.D. 61 (S.D.N.Y. 2002) (recalled diabetes drug); <u>In re Propulsid
Prods. Liab. Litig.</u>, 208 F.R.D. 133, 147, (E.D. La. 2002)(GERD drug);
<u>see also</u> <u>Rezulin</u> 210 F.R.D. at 66 n.35(citing fifteen other district
court decisions denying certification of medical products liability
class actions).  The exceptions are <u>In re Diet Drugs Prods. Liab.
Litig.</u>, 1999 WL 673066, *1 (E.D. Pa. Aug. 26, 1999) (conditionally
certifying class of diet drug users); <u>In re Telectronics Pacing</u>

allegations in Plaintiffs' pleadings and supporting memoranda do not support such a broad class, nor do the expert affidavits that they have submitted.[9]  The proposed class is uncertifiable for over-breadth alone.

At oral argument, Plaintiffs' counsel acknowledged that the class definitions were too broad but invited the Court to pare them down with appropriate limitations fashioned in light of evidence to be presented at the merits stage of the action.  This wait-and-see approach is untenable because, until a class of persons alleged to be entitled to relief is defined, the Court cannot conduct the numerosity, commonality, typicality and adequacy analyses that must precede certification.  It is true that a court has discretion to redefine a class as the case progresses.  However, "[b]efore certification is proper for any

---

Systems, Inc., 172 F.R.D. 271 (S.D. Ohio 1997)(certifying class of pacemaker recipients).

[9] Plaintiffs allege only that "[a]s Dr. Marx explains in his affidavit, all patients taking Fosamax have an increased risk of ONJ." (Plaintiffs Mem. at 26). Indeed, Dr. Mark stated in his affidavit and confirmed at his deposition that dental monitoring only would be appropriate for current users of an amino-bisphosphonate, (Marx. Aff. ¶ 48; Marx Dep. Tr. at 221), although he would recommend an initial radiograph and CTX test for persons who recently stopped taking Fosamax to make sure everything looked normal. (Marx Dep. Tr. at 231-32).  Dr. Marx also stated that the risk of ONJ is "small" and "insignificant" until three years of continuous use.  Had Plaintiffs attempted to refine the class based on Dr. Marx's expert testimony, it would appear that class eligibility should be restricted at least to persons who are currently using Fosamax.  Such a definition would disqualify all three putative class representatives from class membership because each is a former user.

purpose . . . a court must ensure that the requirements of Rule 23(a) and (b) have been met." Denney v. Deutsche Bank AG, 443 F.3d 253, 270 (2d Cir. 2006).  As discussed below, the broad, ill-conceived classes proposed by Plaintiffs fail to meet many of Rule 23's requirements.

Even if Plaintiffs had suggested a more narrowly drawn class definition that, based upon the allegations and the evidence currently before the Court, imposed rational limitations regarding, among other things, dosage, duration of use and medical history, they likely would have encountered other class definition problems.  Several decisions denying class certification in pharmaceutical products liability and medical monitoring cases have found that class membership is not feasibly ascertainable where it hinges on myriad medical factors individual to each class member. See, e.g., In re Aredia and Zometa Prods. Liab. Litig., 2007 WL 3012972, *2 (M.D. Tenn. Oct. 10, 2007)(finding that the identification of members of a class of intravenous bisphosphonate users seeking dental monitoring for ONJ would require too many individualized determinations including dosage, duration of use, unique risk factors, the condition for which the drug was prescribed, information about the drug that the patient received from all sources, and co-prescriptions); In re Rezulin Prods. Liab. Litig., 210 F.R.D.

61, 74 (S.D.N.Y. 2002)(rejecting medical monitoring class of "all users of Rezulin who are presently asymptomatic and have not manifested physical injury" because a "class definition that calls for a 'medical conclusion' based on 'plaintiff-specific information' is 'an improper basis for maintaining a class action.'" (internal citation and quotation marks omitted)); see also Perez v. Metabolife Int'l, Inc., 218 F.R.D. 262, 268 (S.D. Fla. 2003) (medical monitoring class of users of an over-the-counter dietary supplement not properly defined where individual determinations would have to be made regarding dosage and duration of use).

### B. Rule 23 Requirements

The motions for class certification also fail to meet several of the requirements of Rule 23(a) and (b).

#### 1. Rule 23(a)

##### a. Numerosity

Numerosity exists where the class is so large that the joinder of all members would be impractical. Merck does not challenge the proposed class on the ground that it fails to satisfy the numerosity requirement. According to Merck, millions of people in the United States and around the world are prescribed Fosamax every year. Tens if not hundreds of

thousands of these people undoubtedly live in the states of
Pennsylvania, Florida and Louisiana.  Given the very low
frequency of ONJ among Fosamax users, it is safe to say that
most of these individuals have not received a diagnosis of ONJ
and, therefore, would fall into the proposed class.  Joinder of
all these individuals would be impossible, so the proposed class
meets the numerosity requirement.

      b.  Commonality

      "The commonality requirement is met if plaintiffs'
grievances share a common question of law or of fact." <u>Robinson
v. Metro-North Commuter R.R. Co.</u>, 267 F.3d 147, 155 (2d Cir.
2001) (quoting <u>Marisol A. v. Giuliani</u>, 126 F.3d 372, 376 (2d
Cir.1997) (per curiam)).  One element of a medical monitoring
claim under Pennsylvania, Florida and Louisiana law—that the
monitoring sought makes the early detection of ONJ possible—
seems susceptible of generalized proof. <u>But see</u> <u>Perez</u>, 218
F.R.D. at 272 (holding that commonality was not satisfied in
proposed medical monitoring class because all elements of a
Florida medical monitoring claim involve individualized issues).
Because the class members' claims share at least one common
question of fact, the commonality requirement is met.

c.  Typicality

Rule 23(a)(3) requires that "the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." Robinson, 267 F.3d at 155 (quoting Marisol A., 126 F.3d at 376).  The typicality and commonality requirements "'tend to merge' because '[b]oth serve as guideposts for determining whether . . . the named plaintiff's claim and the class claims are so inter-related that the interests of the class members will be fairly and adequately protected in their absence." Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 291 (2d Cir. 1999) (alterations in original) (citing Gen. Telephone Co. v. Falcon, 457 U.S. 147, 157 n.13 (1982)).  This prerequisite "does not require that the factual background of each named plaintiff's claim be identical to that of all class members; rather, it requires that the disputed issue of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." Id. at 293 (internal quotation marks omitted).

Plaintiffs argue that typicality is met because the claims of all class members arise from Merck's failure to warn of ONJ and because, within each class, all members are pursuing the same state-law medical monitoring claim. This formulation of the issue approaches the typicality inquiry at an excessive level of abstraction. In evaluating typicality, "[a] test which is useful is to compare what is needed to prove the plaintiff's claim with proofs needed for those of the proposed class." Newburg on Class Actions § 17:11. As Plaintiffs correctly note in their memorandum, "Typicality can be summed up in [a] nutshell—as the class representative's claims go, so go the claims of the class." (Plaintiffs' Mem. at 17 (citing <u>Sprague v. General Motors Corp.</u>, 133 F.3d 388 (6th Cir. 1998)). In this case, the class representatives' claims will hardly advance the claims of other class members at all. As discussed below, almost every element of a medical monitoring claim will require highly individualized proof of each class members' medical condition and the circumstances of their use of Fosamax. Therefore, Plaintiffs cannot show that their claims are typical of all other current and former Fosamax users.

For starters, one element of a medical monitoring claim requires each class member to prove that Merck was negligent. The named class representatives cannot advance a

single collective theory of negligence that applies to all class members.  Proof of negligence will require an assessment of the reasonableness of Merck's actions or omissions in light of what it knew or should have known about the risk of ONJ at the particular time that each class member used Fosamax. See In re Baycol Prods. Litig., 218 F.R.D. at 208. ("[N]egligence claims depend on individual facts-whether there is a breach of duty or the foreseeability of harm will depend on what Defendants knew or should have known at the time Baycol was prescribed and whether Defendants acted reasonably based on the knowledge it had at that time.").  What Merck knew or should have known about the risk of ONJ likely changed over time:  the first cases of intravenous bisphosphonate-associated ONJ were published in the fall of 2003; the first cases of oral bisphosphonate-associated ONJ were published in the spring of 2004; the FDA found that ONJ may be a class effect of bisphosphonates in August of 2004 and recommended in January of 2005 that Merck provide a warning. Those taking Fosamax at different times stand in different postures with respect to proving that Merck should have known about a risk of ONJ.  For example, one who ceased taking Fosamax in 1999, such as Dr. Nichols, will have to prove that Merck should have known of a risk before any association between ONJ

and bisphosphonates was published, a more difficult case than other class members who used Fosamax during later periods.

Moreover, Merck's actions with respect to warning consumers about the risks of ONJ were not uniform throughout the relevant period. From Fosamax's approval date until the July 2005 label change, Merck provided no warning at all of any association between the drug and ONJ. Since then, the warning quoted above has been given. Some members of each proposed class, such as Dr. Nichols and Ms. Murphy, will have to prove that Merck was negligent because it failed to give any warning. Post-June 2005 users will have to argue that the current warning is inadequate. No one class member's theory of negligence is typical of all other class members' claims.[10]

Even if these differences could be eliminated by artful sub-classing, as Plaintiffs' counsel suggested at oral argument, the remaining elements of the medical monitoring

---

[10]     Other courts in pharmaceutical products liability cases have found that the individual issues enmeshed in proving negligence weighs heavily against certification. See e.g. In re Baycol, 218 F.R.D. at 205-06 ("Because the theories asserted by this putative class are based on what Defendants' knew at the time Baycol was prescribed, and whether Defendants acted reasonably based on such knowledge, the claims of the named representatives are not typical of the class."); Wyeth, Inc. v. Gottlieb, 930 So. 2d 635, 641 (Fla. App. 3 Dist. 2006) (rejecting medical monitoring class under Florida law in part because "the issue of negligence would require specific proof as to what [defendant] knew at the time each plaintiff was prescribed Prempro" and defendant's knowledge and warnings did not remain static during the period of time that the drug was on the market).

claims involve many more individualized questions that preclude a finding of typicality. The fourth element, that exposure to Fosamax proximately caused a significant increase in the risk of contracting ONJ, presents an insurmountable obstacle. A plaintiff cannot prevail by proving that, in general, Fosamax could cause a significant increase in the risk of ONJ in some users. See Barnes v. American Tobacco Co., 161 F.3d 127, 145 (3d Cir. 1998) (upholding lower court's decision decertifying Pennsylvania medical monitoring class in part because "plaintiffs cannot prove causation by merely showing that smoking cigarettes causes cancer and other diseases" but "must demonstrate that defendants' [acts] caused each individual plaintiff to have a significantly increased risk of contracting serious latent diseases thereby demonstrating the need for medical monitoring"); see also In re Agent Orange Prod. Liab. Litig., 818 F.2d 145, 165 (2d Cir.1987) (stating that "[t]he relevant question, therefore, is not whether Agent Orange has the capacity to cause harm, the generic causation issue, but whether it did cause harm and to whom."). Nor have Plaintiffs sufficiently established that Fosamax causes a significant increase in the risk of ONJ for all class members. Plaintiffs' experts acknowledge that the risk of bisphosphonate-associated ONJ depends on the dosage taken, how long patients took the

drug, how much time has elapsed since patients discontinued using the drug, and whether patients took the drug to treat osteoporosis or Paget's disease. Dr. Marx testified that the risk is "small" and "insignificant" until after three years of continuous use. He also stated that the risk of ONJ is affected by the unique medical history of each patient, such as a history of radiation therapy, infection or trauma to the jaw and osteopetrosis. Defendant's experts assert that chemotherapy, long-term steroid treatment, dental hygiene and disease and several other factors affect one's risk of developing ONJ. A court could not decide whether any class member's ingestion of Fosamax caused him or her to suffer a significant increase in the risk of ONJ without considering these individual factors. Therefore, a class representative's claim with respect to causation is not typical of other class members' claims.[11]

_____

[11] The inherently individualized nature of the proximate cause inquiry is a major reason why class certification has been denied in nearly every pharmaceutical products liability medical monitoring case to date. See, e.g. In re Baycol, 218 F.R.D. at 213 ("Plaintiffs' expert . . . pointed out that the risks of future injury vary depending on the amount and length of time during which Baycol was ingested. Thus, the potential for future injury can only be decided by looking to the individual medical histories of the class members."); In re Paxil, 212 F.R.D. at 551 ("[I]ndividual questions of fact regarding causation nevertheless subvert any benefits to be gained through a class action proceeding. Whether, and to what extent, Paxil causes discontinuation symptoms varies from patient to patient. Not only do individual physiologies affect the causation issues, but so too do the underlying illnesses and medical history of each individual plaintiff."); In re Rezulin, 210 F.R.D. at 66-67 ("[T]he issue whether Rezulin caused physical injury to a specific class

Furthermore, a medical monitoring claim requires proof that "the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles." As the evidence presented shows that the risk of ONJ varies depending upon a Fosamax user's unique medical history and the circumstances surrounding his or her use, the Court is not satisfied that the need for the proposed monitoring program could be proven on a class-wide basis. See Barnes, 161 F.3d at 146 (holding that "the requirement that each class member demonstrate the need for medical monitoring precludes certification" of a Pennsylvania state-law medical monitoring class); Perez, 218 F.R.D. at 272 (finding that this element of a Florida medical monitoring claim "is likely to be an individualized matter" because it depended on each class members' history of drug usage).

Other elements of a medical monitoring claim also defeat typicality. For example, Plaintiffs must establish exposure to a "proven hazardous substance." The hazardousness of a given substance would seem to be a common question in the

_____

member will depend on his or her unique characteristics such as family
and medical background, preexisting medical conditions, age, gender,
life style, drug or alcohol use, quantity of Rezulin ingested,
duration of  course of treatment, whether it was used as an initial
therapy and whether Rezulin was used alone or in conjunction with
other drugs.").

typical toxic tort case. In this case, however, Plaintiffs have
cited no authority for the proposition that a pharmaceutical
drug that currently enjoys FDA-approval can be proven to be
inherently hazardous to all persons who have taken it. The only
plausible claim would seem to be that Fosamax is hazardous under
certain circumstance, which of course would vary from class
member to class member. Wyeth, Inc. v. Gottlieb, 930 So. 2d 635,
640 (Fla. App. 3 Dist. 2006) (finding that this element did not
present a common question because "the hazardous nature of
Prempro has not been proven as it continues to be approved as
safe and effective by the FDA"). Even the first element of a
medical monitoring claim, that the plaintiff has had "exposure
to greater than background levels" of Fosamax, presents an
individualized question of fact. In addition, Louisiana law
would require each class member to prove a manifest injury to
which the dental monitoring is directly related on an individual
basis. Because each class member must offer highly
individualized proof to establish most elements of a medical
monitoring claim, the claims of the named plaintiffs, or any
individual Fosamax user for that matter, are not typical of all
other current and former users.

31

d.  Adequacy

        Rule 23(a)(4) requires that "the representative
parties will fairly and adequately protect the interests of the
class."  This entails a two-part inquiry: (1) whether
plaintiffs' attorneys are qualified, experienced and able to
conduct the litigation and (2) whether the lead plaintiffs'
interests are antagonistic to the interests of other members of
the class.  See In re Merrill Lynch & Co., Inc. Research Reports
Secs. Litig., 2007 WL 2493687, *7  (S.D.N.Y. Sept. 4, 2007).

        The Court believes that lead counsel could prosecute
the proposed class action as ably as any other attorneys and the
first prong of the adequacy test is met.  However, given the
inherent differences in the claims of the class representatives
from those of other class members, discussed above, it is
possible that the class representatives would rely on arguments
that are adverse to the interests of other class members.  As an
example, the class representatives may argue that the absence of
chemotherapy or long-term steroid treatment in their medical
histories rules out alternative causes of an increased risk of
ONJ.  This position seems antagonistic to the interests of class
members who have undergone such treatments, who would prefer to
argue that those treatments are not causes of ONJ at all.

The adequacy of the class representatives is also undermined by their decisions to seek monetary damages for themselves but only medical monitoring for the class, which may cause substantial prejudice to other class members. Res judicata may preclude class members from later litigating personal injury claims that could have been brought in the earlier action. See, e.g., Foster v. St. Jude Medical, Inc., 229 F.R.D. 599, 604-05 (D.C. Minn. 2005)(adequacy-of-representation requirement not satisfied in a pharmaceutical products-liability action where named plaintiffs sought compensatory damages and medical monitoring for themselves, but only medical monitoring for the proposed class, because this jeopardized the class members' rights to bring such a claim in a subsequent case due to the operation of res judicata). This possibility of prejudice leads the Court to conclude that the named plaintiffs will not adequately represent the interests of other class members.

2. Rule 23(b)(3)

a. Predominance

The Rule 23(b)(3) predominance requirement is more demanding than the commonality requirement under Rule 23(a). Moore v. PaineWebber, Inc., 306 F.3d 1247, 1252 (2d Cir. 2002).

"In order to meet the predominance requirement of Rule 23(b)(3), a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole ... predominate over those issues that are subject only to individualized proof." Cordes & Co. Fin. Srvcs., Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d 91, 108 (2d Cir. 2007) (quoting In re Visa Check/MasterMoney Antitrust Litigation, 280 F.3d 124, 136 (2d Cir. 2001). As discussed above, almost every element of a medical monitoring claim under the laws of Pennsylvania, Florida and Louisiana would present case-specific questions that are central to whether class members entitled to recovery in this case. These individualized questions clearly predominate over any common questions in the case.

In addition, class members may be subject to individual defenses. Under the laws of Pennsylvania, Florida and Louisiana, Merck will be entitled to raise affirmative defenses to the medical monitoring claims such as comparative negligence and assumption of the risk. Barnes, 161 F.3d at 143 (finding that defense of either contributory or comparative negligence would be available in a claim for medical monitoring under Pennsylvania law and raised individual questions that, along with others, made certification of class of tobacco-users

improper); La. Rev. Stat. Ann. § 9:2800.57 (providing a defense
to the manufacturer in products liability actions where "The
user or handler of the product already knows or reasonably
should be expected to know of the characteristic of the product
that may cause damage and the danger of such characteristic").
Comparative negligence and assumption of the risk require
assessment of what each class member knew of the risks of ONJ at
the time he or she took Fosamax, for example from warnings given
by the prescribing physician or through independent research.
See, e.g., In re Rezulin, 210 F.R.D. at 67 (finding that
individual questions predominated in part because the individual
class members may be subject to the defense of comparative or
contributory negligence, especially where "there were several
changes in the labeling of Rezulin during its brief period on
the market, thus altering the total mix of information available
during the various periods in which class members took the
drug."). These defenses must be resolved on a case-by-case
basis.

        The predominance of individual issues is not changed
by the fact that each class action would require application of
the law of only one jurisdiction— Pennsylvania, Florida or
Louisiana. Although the necessity of applying the laws of
multiple states has factored into the decisions of other courts

rejecting class certification in pharmaceutical products liability actions, it has been but one factor among many. <u>See In re Rezulin</u>, 210 F.R.D. at 67 ("[A]ll of these individual issues would be present regardless of whether the Court must apply the law of one jurisdiction or of many."). Due to the predominance of individualized issues over common ones in this case, certification of the proposed medical monitoring class as a Rule 23(b)(3) action is improper.

     2.  <u>Superiority</u>

     Rule 23(b)(3) also requires a plaintiff to show that a "class action is superior to other available methods for the fair and efficient adjudication of the controversy." The rule sets out the following factors to consider with respect to the superiority analysis:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3).

     The Court finds that case-by-case adjudication of these claims would be superior to a class action for several reasons. First, class members have a strong interest in

controlling their own claims.  Class members may wish to seek a
monitoring program that is tailored, under the advice of their
own physicians, to their individual preferences and unique
medical histories.  No medical association has recommended that
any Fosamax user, either current or former, receive twice-yearly
radiographs, and the effectiveness of the CTX test in detecting
a heightened risk for ONJ does not seem to be universally
accepted.  There is an insufficient basis to believe that all
class members would prefer the proposed monitoring program to
one designed with their own particular circumstances in mind.

Plaintiffs allege that, for each class member, the
potential recovery of dental monitoring services is so small
relative to the cost of bringing a lawsuit that class members
have little economic incentive to bring monitoring claims
individually.  Therefore, aggregation of these claims in a class
action is a superior means of adjudicating them.  There is no
reason, however, why class members must limit the relief they
seek to dental monitoring.  The class representatives themselves
seek monetary damages for medical expenses already incurred,
other side effects allegedly caused by Fosamax, and/or mental
distress resulting from the increased risk of ONJ.  Hundreds of
other Fosamax users have already filed suit against Merck

seeking similar relief under many legal theories, and more
lawsuits are filed each week.  If these cases yield positive
results for plaintiffs, more Fosamax users can be expected to
come forward and prosecute their individual claims.  In
contrast, certification of the proposed monitoring-only class
could lead to the result that class members who fail to opt out
will be barred from later seeking damages by operation of res
judicata.[12]

        The proposed class action also would place a court in
the undesirable position of trying to determine in one action
the monitoring procedures to which tens or hundreds of thousands
of former and current Fosamax users are entitled.  The FDA has
studied and addressed the risk of oral bisphosphonate-associated
ONJ to some extent, but it has not yet recommended monitoring
for anyone who takes Fosamax.  This may be due to the fact that
the condition is a recent phenomenon, the scientific

---

[12]     The Court also has serious reservations about the
feasibility of providing every person in Pennsylvania, Florida and
Louisiana with the notice required by Rule 23(c)(2) that would enable
them to exercise their right to opt out and pursue their claims
individually.  See Valentino v. Carter-Wallace, Inc., 97 F.3d 1227,
1234 (9th Cir. 1996) (noting "serious due process concerns" about
whether adequate notice could be provided to class of all persons who
have developed or will develop side effects from use of epilepsy
drug).  The proposal of Plaintiffs' claims administrator—that it might
be possible to provide direct notice to all class members if Merck has
their names and addresses in its records, otherwise notice will be

understanding of which is in an early stage. Dr. Marx himself states in a book published this year that the condition "is too new for any group to have controlled research data or long-term experience." Robert E. Marx, <u>Oral & Intravenous Bisphosphonate-Induced Osteonecrosis of the Jaws</u> viii (2007)). The proposed class actions call for an extraordinary intrusion into the FDA's regulatory mandate, even while many in the scientific community believe that more research is needed. In this regard, the Court concurs with the sentiments of the district court in <u>In re Propulsid Products Liab. Litig.</u>:

> [T]he issue of the timeliness of the requested remedy presents a significant obstacle for the plaintiff. Neither the FDA, nor any medical organization or institution, nor anyone else for that matter, except the plaintiff's expert, has recommended or suggested that a program of medical monitoring or a group study of all former Propulsid users be undertaken. This raises the issue of the role of the courts in such an instance. Stated succinctly, the question is whether the courts should lead the scientific community in an area of medical science.

208 F.R.D. 133, 147 (E.D. La. 2002). Assuming that it would be appropriate for a court to determine whether someone who takes an FDA-approved drug is entitled to medical monitoring even before the FDA recommends such monitoring for any user of the drug, a more cautious, case-by-case approach focusing on the

---

provided through indirect advertising, (Mulholland Aff. ¶ 10)—does not allay these concerns.

particular factual circumstances of individual plaintiffs would be more prudent.

Finally, the predominance of individual questions would make the proposed class actions unmanageable. Plaintiffs have submitted no real proposal as to how these claims can be tried on a class-wide basis. Instead, they have given only general assurances that individual questions can be managed or eliminated through sub-classing and bifurcation. Moreover, Plaintiffs have not convinced the Court that the significant manageability difficulties posed by the class actions would be offset by any gain in efficiency. Most of the efficiency gains that class-treatment could bring in a case such as this have been captured already by the consolidation of all Fosamax cases in this Court for pre-trial proceedings. See Blyden v. Mancusi, 186 F.3d 252, 271 (2d Cir. 1999); Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1235 (9th Cir. 1996)(decertifying class of epilepsy drug users when "there has been no showing why the class mechanism is superior to alternative methods of adjudication, particularly when coupled with the discovery coordination that is made possible by the JPML consolidation."). For these reasons, the Court sees no reason why class-treatment of these claims would be superior to adjudications on an individual basis.

## Conclusion

For the foregoing reasons, the motions for class certification are DENIED.

**SO ORDERED.**

**Dated:    New York, New York**
**January 3, 2008**

JOHN F. KEENAN
United States District Judge